UNITED STATES of America,
Plaintiff-Appellee,

v.

Walter Odel GRAHAM and Patricia Ann Taylor, Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Lonnie PATRICK, Defendant-Appellant.

Nos. 75–1800 and 75–2629.

United States Court of Appeals,
Ninth Circuit.

April 21, 1976.

Bernard G. Winsberg (argued), Los Angeles, Cal., for defendants-appellants.

J. Robert Liset, Dept. of Justice (argued), Los Angeles, Cal., for plaintiff-appellee.

## OPINION

Before: WRIGHT, CHOY and KENNEDY, Circuit Judges.

PER CURIAM:

Appellants Graham, Taylor and Patrick were convicted after trial to the court of conducting an illegal gambling business [18 U.S.C. § 1955], consisting of dice and "blackjack" games. Their main contentions on appeal are that their acts were not within the reach of the federal statute in that the dice game was not a "banking or percentage game" proscribed by California Penal Code § 330 and that the business did not meet the "substantially continuous operation" or "gross revenue" requirement of Section 1955(b)(1)(iii). We reject their contentions and affirm.

An "illegal gambling business" under Section 1955(b)(1) is one which:

(i) is a violation of the law of a state or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own *all or part* of such business; *and* (iii) has been or remains in substantially continuous operation for a period in excess of thirty days *or* has a gross revenue of $2,000 in any single day.

(Emphasis added.)

This court recently upheld Section 1955 against constitutional attack. *United States v. Sacco,* 491 F.2d 995 (9th Cir. 1974) (en banc).

■ We are of course governed by the fundamental rule on appeal that the evidence must be viewed in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942); *Kay v. United States,* 421 F.2d 1007, 1010 (9th Cir. 1970). With this standard in mind, our scrutiny of the record convinces us that the government proved each element of the statute as to each defendant, and that the convictions were therefore proper.

■ We address ourselves first to subsection (b)(1)(i) of Section 1955. The operation of a "blackjack" game is clearly prohibited by California Penal Code § 330. Both Graham and Taylor were associated with the blackjack game, as will be discussed below.

Defendant Patrick was associated only with the dice (crap) game. A government agent testified that Patrick was in the same position at the table, engaged in the same sort of activity, on four separate dates. Patrick handled the twenty-five cent "vigorishes," or rental payments, contributed to the establishment by each player.

One witness testified that on one evening Patrick was "running the crap game." Two witnesses testified that "line" or "field" bets were generally placed with Patrick, who handled the money.

There was evidence of a conversation between Patrick and defendant Graham during the course of one dice game. Upon concluding the conversation, Graham passed a slip of paper to Patrick, which he placed in his pocket.

While there were many "side" bets made at the crap table, testimony indicated that "most" of the bets were against the "house."

■ This evidence indicates that the crap game was an illegal "banking" game within

the meaning of California Penal Code § 330. *See People v. Ambrose,* 122 Cal.App.2d 966, 970, 265 P.2d 191, 194 (1953).

■ We turn to subsection (b)(1)(ii). It was stipulated below that on each Friday, Saturday and Sunday between June 29 and November 2, 1974, gambling consisting mainly of the card game "blackjack" or "twenty-one" and the dice game "craps" was conducted by at least five persons.

■ The record shows that Graham organized the club where the gambling took place, paid the employees, and dealt occasionally at the blackjack table. Taylor sold chips for blackjack. Clearly, each "conducted" "all or part of" the illegal gambling business, within the meaning of subsection (b)(1)(ii). *See Sacco,* 491 F.2d at 1001–02.

■ The foregoing evidence with respect to defendant Patrick convinces us that he was "conducting" the crap game, a "part of" the entire illegal gambling business, within the meaning of subsection (b)(1)(ii).

■ Turning to subsection (b)(1)(iii), we find that this illegal gambling business had a "gross revenue" of well over $2,000 in a single day. Therefore, we need not determine whether it was in "substantially continuous operation."

■ The statutory term "gross revenue" has been defined by this court to mean "the total amount wagered in one day. . . . regardless of the luck of the odds." *Sacco,* 491 F.2d at 1001. We note, too, that only the entire "illegal gambling business" must have a single day's gross revenue of $2,000 or more. Thus several gambling functions, if part of the same "business," would together constitute an "illegal gambling business" (assuming, of course, the requirements of subsections (i) and (ii) were fulfilled) if they grossed in aggregate $2,000 or more in a day.

A government undercover agent testified that on June 29, 1974, approximately twelve persons were playing blackjack, and betting an average of approximately $3.00 per person per hand, each hand lasting about two minutes for all players in a given game. This testimony was contradicted only by the most conclusory statements by defendant Graham.

Thus a total of approximately $1,080 was bet every hour at the blackjack tables. The agent testified that on June 29 he stayed at the gambling club approximately three hours, from two to five A.M. Defendant Graham testified that the games usually lasted from two until six A.M. It is abundantly clear that more than $2,000 was wagered on June 29 at the blackjack tables alone.

It is equally clear that all sums bet at the blackjack tables constituted "gross revenue" of the business. A government witness testified that the deal did not pass from one player to another. If a player lost, his chips would go to the dealer. There was testimony that both defendant Graham and one Merrill Cole, Sr., dealt blackjack on several occasions. At least on one occasion a government agent gave money to Cole, the dealer, and Cole passed it to a woman in exchange for chips. Defendant Graham testified that when Cole was dealing, "[i]f the game made some money, then he would give me some money."

This evidence, although largely circumstantial, convinces us that the sums bet at the blackjack tables constituted "gross revenue" of the business.

As for the crap game, the record shows that an estimated $2,400 was bet every 30 minutes. One witness testified that "five or six hundred dollars" would be bet on a "good roll of the dice." While some were side bets, the record indicates that the bulk of the money was wagered against the house. It is clear to us that the management received "gross revenue" of well over $2,000 a day on the crap game alone.

Since the record shows that all elements of the statute were proven as to each defendant, the convictions are affirmed.